The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, Oyez, Oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Thank you very much. Welcome to the Fourth Circuit. Please be seated. Rachel, can you come up for a minute just before we get started? All right. We're ready for argument in our first case, United States v. Shivers. Mr. Carpenter? May it please the Court. We are asking you to hold that the undisputed facts of this case do not satisfy the substantial risk standard under 3C1.2. The bottom line in our view is that the act of discarding a firearm de-escalates and decreases the overall risk present in the situation. So that act, standing alone, cannot be enough to justify the enhancement. The analysis in this case begins with a background principle. In seeking to apply an enhancement, the government bears the burden of proof. And here, the only evidence that the government submitted to sustain this enhancement was the undisputed statement of relevant conduct present at Joint Appendix 142 and 143. And the only statement or assertion in that document related to the flight was that the officer saw Mr. Shivers discard the firearm. So the question, put simply, is whether that act, without more, justifies the enhancement. And we believe it does not. The government defends the enhancement based on three separate theories. One arising from the handling of the firearm. One arising from a risk of discharge when dropped. And the third arising from a risk of abandonment in the community. Each of these is insufficient. So if we start with the handling of the firearm, the government on that theory relies primarily on the Dennings case. But the two key facts that were established in the Dennings case are not present in this case. The first fact in Dennings was that the defendant there handled the firearm during flight in a way that was provocative. That caused the officers to believe there was a possibility he was about to draw the firearm and use it. That action created a risk of the officers firing in self-defense that could have harmed either other officers or bystanders in the area. The second fact that was present in Dennings that isn't present here. So if the defendant had thrown the firearm at the police officer or at some other person, would that have been sufficient? Most likely, Your Honor, yes. If there was something about the manner in which the firearm was thrown that went above and beyond simply tossing it onto the ground, then it was incumbent upon the government to allege whatever that aggravating fact was, and then we could have analyzed whether that aggravating fact was sufficient. Certainly throwing a hard metal object like a firearm at someone itself creates a risk, regardless of whether it's a firearm or some other hard metal object. That would create a risk of harm simply by the act of throwing it at someone. So again, the government did not allege that fact. They did not allege anything about the manner in which he threw it. Was there any testimony by the officer or some other witnesses to the likelihood of discharge based on the type of firearm? Your Honor, was the question, is there testimony in this case about that? Correct. There is none. Again, the only evidence that the government put in to support this enhancement is at Joint Appendix 142 and 143. It is a statement of relevant conduct. The facts in it are undisputed. There was no, once we objected to those facts as being sufficient, the government had the opportunity at the sentencing hearing to marshal any additional evidence it could have to put on the type of testimony, Judge Agee, that you're suggesting. The government declined to do that. That leaves us, that leaves this court with the simple question, does the single undisputed fact in this document that the firearm was discarded in plain view of the officer justify the enhancement? And again, page 142, there's paragraph 17. Officer Crum noticed the suspect throw a silver revolver in the street as he ran toward Grove Street. The firearm was later recovered and determined to be a Taurus .357 revolver. Is that it? That's it. The question before this court is, does that single paragraph support this enhancement? And our position is that because the mere act of discarding is de-escalatory, it eliminates two possible risks, the two possible risks that were present in Dennings. By putting the firearm on the ground, that tells the officers in pursuit that this defendant is not going to fire at them. So one risk eliminated by the discarding. The second risk that was present in Dennings, the firearm remained in the defendant's pocket at the time of a struggle when he resisted arrest. As Dennings pointed out, that creates a risk of accidental discharge during the struggle. By putting the firearm on the ground, that risk is also eliminated. And so it all comes down to the simple proposition that putting the firearm on the ground decreases the overall risk. So that action, the only action the government has alleged, cannot be sufficient to justify the enhancement. May I ask you a question about the recklessness mens rea? Yes. What you are arguing is that the safest thing under all the circumstances to do in a situation like this is put the gun down. And that's what happened here. If that's right, can that be reckless? Can you recklessly decrease the risk of a situation? No, Your Honor, I don't think so. I think that our argument has focused primarily on whether the risk was substantial. But I agree that there is also a real question about whether it was reckless in this circumstance. Because what we believe here is that what the government is asking for is effectively a bright line rule that the mere act of discarding is enough. And I think that bright line rule is misplaced because it overstates the risk by assuming that officers are unable to distinguish the circumstances in Dennings where the actions are provocative and the circumstances here where all they see is a discarding of the firearm. I think officers are perfectly capable of making that distinction. The other thing that the bright line rule does is it creates really perverse incentives. Because we want defendants who are fleeing to get rid of the firearm because it decreases these risks. And under the government's bright line rule, there would be no incentive to do that. In other words, the bright line rule fails to distinguish between two significantly different amounts of risk. The risk in Dennings is much higher because of the reasons we've talked about here. Putting it on the ground decreases those risks. And the point of this enhancement is to distinguish between greater risks and smaller risks. And again, that ties back into the commission using the word substantial risk. If the commission had used any risk or any unjustifiable risk or any other formulation, we might have a different question here. But the word substantial means, according to the dictionary definition, present to a large degree. Because of that, we cannot justify this enhancement based on small risks. So the second theory that the government uses for justifying the enhancement is that there was a risk of accidental discharge from the mere act of dropping. We think that risk isn't present on the facts of this case for really two kind of separate sets of reasons. The first is there is no allegation that the gun was in a condition where it was ready to discharge. For example, being cocked, having a safety off, or any other evidence that would show that merely hitting the ground could cause a risk of discharge. All of the cases, like the Mukes case and even the Lard case in the Seventh Circuit, that talk about this risk of accidental discharge from dropping. Apply that theory only if there is evidence in the record that the gun is in a condition where it's ready to fire. That evidence simply isn't present here. Mr. Carpenter. Yes. With regards to the gun, it was loaded. What about the risk of someone picking it up in the area? That was another concern raised in the case. Yes, Your Honor. That is the government's third theory, the abandonment theory. And the reason that I think that risk isn't sufficient on the record in this case is because there was, again, the undisputed statement of facts, there is a perimeter established around this area, and the gun was dropped in plain view of the officer. So that puts this case on all fours with respect to abandonment as the Mukes case in the Sixth Circuit, where they said, look, even if there is, in theory, a risk of abandonment, for example, if it's dropped in a preschool, an elementary school playground, that's a very different situation than where it is dropped in front of a pursuing officer in plain view, particularly here where there's a perimeter established. In that scenario, there's really no risk, much less a substantial risk, that a bystander is going to come across the firearm. So that theory, and I would note the government, excuse me, the district court did not rely on that theory. The government does raise it again, as it's allowed to do, but I do not think the evidence in the case supports it. The other point I want to make about the risk of accidental discharge, aside from the evidence, the lack of evidence that the gun was cocked or otherwise ready to fire, I would point the court to the expert opinions included in that Washington Post article that we cited about the Alec Baldwin shooting. It is simply a myth that modern firearms are at any real risk of discharging simply from being dropped on the ground. It's a myth that comes from popular culture. It comes from cartoons like Yosemite Sam and the old Looney Tunes stuff. We see it all the time, and it seeps into our brains that that's a real risk. It simply doesn't exist in the real world with modern firearms. You didn't tender any evidence to that effect. No, but it's not a burden to do so. And the government also has not tendered any evidence to say that a modern firearm, and in fact, if you look at the government's brief at page 22, they effectively concede this point in saying that we are correct, that additional steps such as cocking the firearm would be necessary, and pulling the trigger would be necessary for the firearm to discharge. They say, well, but there is also a risk of a malfunction. But that risk, whatever risk there is of a malfunction, is not enough to meet the substantial risk standard. And the government certainly hasn't introduced evidence that modern firearms malfunction frequently enough to create a substantial risk as opposed to a merely theoretical risk. And again, the commission used the word substantial, and we have to give it meaning in the analysis. So if the government qualified the police officer, for instance, as a firearms expert based on experience and training, and he testified or she testified that based on their experience with this particular type of revolver, it was subject to accidental discharge, would that have been sufficient? Absolutely. I mean, of course, we would have had the opportunity to cross-examine, to try to probe whether that is a valid and strong opinion. Assuming that we go through the adversarial process and the district court finds, as a matter of fact, that that expert is sound, then we're in a different scenario. The government didn't do, of course, any of that in this case. The final point, I'm happy to answer other questions, but the final point I would touch on is the government also briefly makes a harmless error argument in this case. I think there are two good reasons to reject that. The first is that the district court specifically declined to enter an alternate sentence when given the opportunity to do so. That by itself, I think, is enough for the harmless error argument to fail under this court's standard, which requires confidence that the court would impose the same sentence. The district court specifically declined to say it would. I think that tells us that it is reserving the possibility of doing so. And the second point on that is that the rationale that the district court gave for its small variance in this case is one that would apply based on the lower guidelines range as well. The court relied on two separate factors. One, that this enhancement was somewhat overstating the seriousness, but it also relied on the defendant's history and characteristics, in particular his rehabilitation evidence during his imprisonment. That factor, of course, would remain present and could justify potentially a small variance from the correctly calculated guidelines range. I think the district court judge here, in answer to the United States question, would have simply said, yes, I would. I would find the 3553 sufficient to have imposed exactly the same sentence. Would that be enough? Most likely, yes. Much to my chagrin, that is what this court's case law generally holds, that if the district court makes a statement like that on the record, that it would impose the same sentence. That at least satisfies the first prong of the harmless error test. The second prong would require proof that that sentence is substantively unreasonable. Your argument here is that the court didn't say that. Correct. The court didn't say that. In fact, the court specifically declined to say that. He said, I will say that the guidelines were not a significant factor, but he didn't say they were no factor at all. And we acknowledge they weren't a significant factor. We're under no illusion that on a remand in this case, we're going to go from 114 months down to 50 months. But we do think we could go from 114 months 6, 9, or 12 months lower, based on the correctly calculated guidelines range. And that is important to Mr. Shivers, and that's why we believe that the remand is necessary and that the harmless error argument must fail. If there are other questions, I'm happy to answer them. Otherwise, I'll yield the remainder of my time until rebuttal. All right. Thank you. You've got some rebuttal time. Mr. Enright, you must have edged out Ms. Ray this morning, but we're glad to have you. Go right ahead. Thank you, Your Honor. May it please the Court, Anthony Enright for the United States. The district court properly applied the two-point enhancement for reckless endangerment during flight. I want to point this court to a portion of the joint appendix that my friend, I think, overlooked, because there's a little bit more to it than just on page 142. There's also page 160, which is the probation officer's own assessment of the evidence. And the court said when he is referring to Mr. This is the probation office, but it's a statement accepted by the court and, as Mr. Carpenter mentions, is undisputed. When he, Mr. Shivers, did come out of the store, loud, clear commands were given to Shivers to get on the ground while law enforcement pointed firearms at him. The defendant disregarded those commands and fled from authorities while armed. And what the defendant has conceded is that he did that while armed with the gun in his hand, not hidden from view, not safely holstered, not in his jacket pocket, in his hand. Furthermore, during flight in a congested area of downtown Asheville, Shivers threw his firearm in the street. Now, the reason I read that and emphasize that is because it places this case on all fours with this court's presidential decision in Dennings. In Dennings, the court said, the defendant ignored repeated commands from a police officer to stop running, just like Shivers, continued to flee on foot while armed with a loaded weapon, just like Shivers. Weren't they fighting over the gun in Dennings? There was a factual statement in Dennings that said the defendant fell on the ground and the police officer ended up on top of him and then they struggled over the firearm. But what this court held was this conduct before that altercation occurred was in this words, this conduct satisfies 3C1.2. And this court repeatedly emphasized what was significant was the fact that he had the firearm in his hand. What he was doing with his hands and that firearm, regardless of whether Dennings was carrying the firearm, putting it back in his pocket, reaching to retrieve it from his pocket, or trying to keep it inside his pocket as he ran, his movements created a substantial risk of death or serious violence. What we said in Dennings was that what created the risk, at least the risk that the police might deploy force in self-defense, was that they saw him making these gestures at his pocket and they didn't know what he was going to do if that was a gun. Yes. And here, it's obvious what he's going to do. He's going to drop the gun on the ground. That is literally all the officers saw him do. That is at some point, Your Honor. But prior to that, he ran with the gun in his hand, disregarding officers' guidance. That's not what we identified as what was the reckless part of the behavior. What we thought was the reckless part was the part where he made gestures that left the police unaware of what he was planning. But one of those gestures, Your Honor, that the court refers to, I think it's on page 238 or 239, was that he appeared to be holding a gun. Here, there's no dispute. He was holding a gun. That's the gesture. Every moment a defendant is running. So you're understanding that the district court held that this applies not because he threw the gun down but because he had a gun in his hand at some point. Because that is not how I read the district court decision. It's not how I read the district court decision either. The district court held that he pulled it out of his pocket, and the pulling motion was the kind of handling that satisfies Denning. So that's not what you're defending today. You have a different theory you want us to look at. No, Your Honor. I think either way, because Denning tells us that. Regardless, Denning actually says, regardless of whether he was manipulating it from his pocket, pulling it out, or holding it, that conduct creates a reckless situation. And it makes sense. That's the conduct, not the throwing of the firearm. The throwing of the firearm is in addition to that conduct. The reason I started with that conduct is because I think it places it on all fours with Denning's. He took the additional step of throwing the firearm. What happens if he comes out of whatever story, Rob, police tell him to get on the ground, he takes off running, he stops, pulls the gun out, sets it down on the ground, and then takes off again? Under your theory, is that sufficient? That would be a more difficult case for us, but I think it would be sufficient. Because I think the act of fleeing at all with the gun in your hand while police are giving you commands to stop and pointing guns at you and disregarding those commands, I think that well meets the threshold of substantial risk. And the fact that... So your argument is that eventually he should stop running while he's still got possession of the gun and get down and never get rid of the gun? Your Honor, I do think that he should not disregard commands with the gun in his hand. Your argument is whenever anybody who is armed, committing a crime while armed, does not immediately accede to police authority, that's it. I think that's often going to be a case. That's your argument now. If he has the gun in his hand, I think that is often going to be. When would it not be the case? And how far, I mean, this guy ran for like half a block, right? We're not talking about a prolonged pursuit. What if, like, he just takes two steps and then stops? Your Honor, I think there is a big difference if he can be fairly said, and this I guess would be a factual question in a given case, whether he was responding to police commands. I think we've said that the flight part, I can't remember the language, we construe very broadly. Like what counts as being fleeing would be like a couple of steps. Yes, Your Honor. And if he's armed, when he takes that couple of steps, you would say, I think your argument today is that's it. You shouldn't have taken those couple of steps. Ordinarily, yes, Your Honor. I can't understate how serious a situation it creates when you have a gun in your hand. This is like, obviously committing a crime with a gun makes the crime and everything about it much riskier, which is why Mr. Shivers is sentenced to seven years under 924C because he committed a crime with a gun. Seven years is for the added risk of committing a crime with a gun. Yes, Your Honor. So aren't we kind of double counting that if we say? I don't think so, Your Honor. There are several options he could have done. One, he could have put the gun down before he fled, like the defendant in Nukes. He could have kept the gun holstered in a way that wasn't available to his hands. He could have not run, which I understand that the rule says you don't get an enhancement for running, but it's not like you don't get a reckless endangerment enhancement just for running. But it's not as though you have a right to flee from police. If you put yourself in a situation where you are armed and in a dangerous state, it's not like we have to make a special accommodation so that you can flee in a way that won't be regarded as reckless. If you have a gun in your hand, you have taken the situation to such a dangerous point where there are many, many ways you can make that situation reckless if you haven't already. And there are a handful of ways that perhaps you can flee in a non-reckless way. It seems like the argument could be made if that's what the Sentencing Commission was getting at, that they would have simply written this to me to say fleeing from police while armed is a separate enhancement, and that would cover all these situations. It could have, Your Honor. I think one of the downsides to that is that there's... But they didn't do that, so it's got to be something different. Well, I think it's broader, Your Honor, because you can recklessly endanger during flight without being armed. You can, for example, the example given in Dennings is an unarmed person goes into a stranger's house. That's reckless endangerment. There's a lot of things that have to line up for that to be dangerous to somebody in a non-speculative way, but this court held it was enough. And vehicular flight is very common. There's a lot of ways to endanger somebody that aren't that way. And I appreciate your question, Your Honor, and a point my friend made, which is the language they use. That substantial risk language isn't... I mean, it is a dictionary term, but it is also the exact same formulation that the Supreme Court said is the dominant formulation of recklessness in modern codes and cases. That term is a flexible term that takes into account whether the circumstances, what you're doing. Speeding to take somebody to a hospital in an emergency might not be reckless, whereas simply driving at the normal speed during, for example, intermittent weather could be. It depends on the social utility of what you're doing. I realize that's a term that cases don't ordinarily use, but they do reflect that. And I think Moots reflects that when they held that, well, you can't ask somebody to not drop a gun when the police ask you to drop a gun. That's a different story than if you throw it on the ground on your own initiative because it's appropriate to respond. It seems like the difficulty here is that we have a very limited record, not on the underlying offenses, but on the enhancement, because we don't know with the description of throwing a firearm, did he throw it two feet or 20 feet? Was there any one around? Did he throw it into the movie crowd as they're departing the theater that night? We don't have any evidence about the susceptibility of the firearm to discharge. So there's a lot of evidence that could have come in, but we have to go based on what's in the record. And the fact that we don't have this additional evidence makes it a much more difficult decision. I agree with that, Your Honor. There are scenarios, plenty of them, that would make the case easier one way or another. I would emphasize that the throwing of the firearm was in addition to conduct, that if it is not on all fours with Dennings, which is how I read it, but if it's not, it's very close, and it incrementally certainly increased. I don't understand. I mean, we had held in that unpublished opinion that fleeing with a gun is not enough, and then in Dennings we said specifically we don't have any need to reconsider that here. So how is your argument that fleeing with a gun is per se enough for this enhancement consistent with Dennings? And you specifically said we're not reconsidering our prior law saying it's not enough. The Jefferson decision on which Dennings relied actually spoke about that, specifically said there's no evidence that the gun was displayed. Certainly we would have a much more difficult case if he had the gun in a holster, nobody ever saw it, and he just took off running, and then police found, oh, he's got a gun. That doesn't really, the running doesn't really increase, create any substantial risk of harm. Did you make this argument to the district court? I'm just curious. I do feel like we are so far afield from where the district court was on this. Was this argument made to the district court, forget the throwing of the gun, Your Honor, you are like barking up the wrong tree. This is about the first couple of seconds where he was, I guess, maybe displaying a gun. No, Your Honor, and the reason is because the court found that he had the gun in his jacket, and he pulled the gun out during the altercation. The defendant, Mr. Carpenter, disputed that on appeal. Frankly, I think his statement that he had it in his hand makes it more difficult for him. I was going to ask Mr. Carpenter, like, aren't you asking us to find that the district court made a clearly erroneous factual finding, and on what basis? I believe he's asking that, and I don't really think so, because frankly I think the court gave him the benefit of the doubt. There is no, there was no testimony, and there's no statement that says he pulled it out of his jacket or didn't pull it out of his jacket. I think the court believed it was giving him the more favorable decision, the more favorable ruling when he found that he pulled it out of his jacket and had it in his jacket until he pulled it out of his jacket. So just specifically, do you want us to find that the district court was clearly erroneous when it held that he pulled it out of his jacket, or do you want us to find that the district court was giving him the benefit of the doubt? What should be right in our opinion? I think the answer, I have no objection to this court considering the fact, taking the fact as true, that he had it in his hand. Taking what fact as true? I thought the district court said he pulled it out of his jacket. The district court did say that, and the defense disputes that and says he had it in his hand. Right, but what if, I think generally we go with the district court, and not what the defendant says, unless we can find it's clearly erroneous. On what basis can we find that that was clearly erroneous? I don't suggest that it's clearly erroneous, Your Honor, and this court can accept that as true. If he pulled it out of his jacket, that created the risk that Dennings noted also, as creating a risk that the police would perceive that as... What was the evidence in the record to show a basis for the district court's finding that he pulled it out of his jacket as opposed to simply holding it in his hand? It could make a finding, but if there's no evidence in the record to back it up, then that would be clearly erroneous, wouldn't it? It could be, Your Honor. I think it's a reasonable inference, and frankly, one in his favor. But either way, Dennings specifically says, regardless of whether Dennings was carrying the firearm or reaching to retrieve it from his pocket. Well, let me go back. Can you cite any evidence in the record that shows the defendant removed the firearm from his clothing? No. I cannot. And that's why I am very willing to accept the concession that he had it in his hand. I don't think that helps the defense, because if he had it in his hand, he created, for every moment he had that in his hand, a decision point for each one of those officers who had their guns drawn. Do I need to shoot him to keep him from pulling that trigger, intentionally or accidentally? And if he pulled it out of his pocket, he created a decision point for those police officers. Do I need to shoot him to keep that from happening? I want to turn, and that creates a very dangerous situation, and that's what the 3C1.2 is designed to get to. But I want to address the harmless error point, because the defendant did get the exact sentence he asked for, for the reasons he asked for. The district court said the defense brief, which is where the history and characteristics that the defendant relied on, or that the court relied on, are found. The defense brief outlines my reasons for giving this 114-month sentence, which is what the defendant requested if the court didn't apply the enhancement. And then said, and the guideline doesn't have any significant effect on my decision. Counsel, this is such an unusual case, because I totally take your point on the harmless error argument, and I think if the government had not asked the judge to make it express, you know, say explicitly this is the same amount you would have given, there would probably be a pretty, you know, very plausible argument for harmless error here. But the problem is the government did ask the judge to, you know, say, call this, you know, say the words, so that this will be a harmless error, and the judge wouldn't do it. And so that does make me think that maybe, you know, the judge is reserving the possibility that, and the judge had, you know, discussed, I'm not sure if I'm right about this enhancement or not, and that he absolutely was reserving the possibility that there might be a, you know, probably small, but a small reduction in the sentence if this was wrong. I think that's a fair point, Your Honor. I will note that this Court's decision, Schrader held it explicitly, and Holguin-Hernandez and Savion Matute said very specifically, the Court doesn't need to say it would impose the same thing. Right, but is there any case where the Court is asked to say it, declines to say it, and we still find harmless error? I have not seen one, Your Honor, because ordinarily what I think the Court would do would say one way or another. It would say, no, I want to reconsider this, or I'm not confident that it would impose the same sentence, or would say, sure, that's all we asked for. We didn't ask the Court to do this. Would you tell us what the answer would be? And the Court declined to say either way. It very specifically didn't go the other way either, and reiterated a point. It reiterated a point he had emphasized earlier. He said, I will say I don't consider the technical application of this enhancement to be significant. It's difficult to see what he would do on remand, how the Court could reach the same result consistently with that analysis. Especially when it adopted, it said the defense brief outlines my reasons for my sentence, and the defense brief said a 114-month sentence is no greater than necessary to achieve the purposes of sentencing in the light of my history and characteristics. Well, yeah, we get an awful lot of these. I don't know that I have ever seen one where the district court judge didn't use language that's fairly uniform now. I don't think I've ever seen one of these where there's an equivocation. I think the Court just declined to answer it. I can say the same thing, Your Honor. I've not seen this or anything quite like it before either. But I think the Court's cases... Well, if the Court declined to answer it, how is that an affirmative expression that, oh, I would have imposed the same sentence regardless of how I evaluated these factors? It isn't, Your Honor. But under Schrader and under Salveon Matute, that's not required. All this Court needs is a fair assurance based on the total record that he would have imposed the same sentence. And here we have a lot of evidence of that. In those cases, didn't the district court say, you know, I would impose the same sentence? Not in Schrader, Your Honor. In Schrader, the Court did not do that. And the Court looked at the factors, looked at the Court's explanation in its totality and concluded that with fair assurance it could say with confidence that the sentence would have been the same. And I think those factors, the Court's language about the guideline, the fact that he gave the sentence the defendant asked for, and the fact that he incorporated the defendant's reasoning into its own analysis, provides that fair assurance here. See, my time is almost up. I'm happy to answer any questions this Court may have. Thank you very much, Mr. Enright. Mr. Carpenter, you've got some rebuttal time. Thank you, Your Honor. Let's start briefly with the final point there about harmless error. And I think, Judge Agee, you've pinpointed the most important point, which is that the presence of the equivocation means that the government can't satisfy its burden of showing, as it says, with fair assurance that the record is a whole, because that equivocation is part of the record as a whole. And I think it relates, as Judge Harris, I think you pointed out, to the fact that this district court judge had said, I'm not quite sure I'm right on this. You should take this to the Fourth Circuit and get clarity. And then he reserves the possibility that maybe if he was wrong, he'll give a lower sentence. That defeats the harmless error argument that the government has made here. And I think, Judge Harris, your point that there is simply no case out there where the judge has declined the invitation and this Court has nonetheless found harmless error. The second point I want to go to is that the Schrader case is close to this in terms of language. What do you say? I don't think so. I think Schrader and the other cases that my friend cited simply stand for the magic words proposition, and we don't dispute that. There aren't magic words that you have to say. But what's different about this case is that the Court specifically declined to say the magic words. I mean, we all know there are magic words you can say. Every district court judge knows there are magic words he or she can say that render guidelines errors harmless. This district court specifically declined to say them, and that under this Court's precedent means it's not harmless. The second point I wanted to go to is, Judge Harris, your question about clear error, and I think, Judge Agee, again, you answered that there simply is no evidence in the record about him pulling a firearm out of his pocket. It was not, it's just not present. And when there is no evidence to support it, that is by definition clear error. Does that mean that he was, in fact, displaying the gun for the beginning of the fight? No, it means we don't know. And it's the government's burden to prove it. So if what he did in the few steps is relevant to this enhancement, it's the government's burden to prove it. Was he displaying it? Was he pulling it out? If that's relevant, the government has to prove it. They didn't here. All they alleged was that the officer saw him discard it. I would also quickly take issue with the idea that the judge was doing anything in his favor here. If he had found that he pulled the firearm out, that puts this case on all four with Dennings, and the enhancement applies. So it's certainly the idea that pulling it out, a finding about him pulling it out was helpful in some way, is not correct. And again, I would say there is no evidence that he displayed it. There is no evidence that he pulled it out. There is no evidence either way. And the absence of evidence goes against the government here. The final thing I would mention just briefly for clarity, because I don't think it really much matters but I do think it's worth highlighting, is my friend began by citing Joint Appendix page 160 and the recitation of the facts there. As he noted, that was the probation officer's assessment of the evidence. That wasn't the evidence itself. It was included in an addendum in response to our objection. The government, if it thought that anything in that probation officer's assessment was relevant, the government had the opportunity at a hearing to put on additional evidence. And if you look at the rules of Criminal Procedure Rule 32, G specifically mentions addendums to the pre-sentence report. They're not part of the pre-sentence report itself. The point of an addendum is to highlight unresolved issues and allow the probation officer to comment on them. That queues it up for the district court under Rule 32I to accept any portions that are undisputed and then to hear evidence on any of the disputed issues. The government here declined to introduce any additional evidence in response to the objection, which means we are left going back to Joint Appendix 142, the sentence or the paragraph, Judge Agee, that you read a few minutes ago. The question is, does that allegation standing alone support this enhancement? And for all the reasons that we've discussed, we do not think it does. Put simply, discarding the firearm, the only action that the government alleged was seen here, de-escalates the risk. It decreases the risk to everyone involved in the situation. And for that reason, that single action cannot be enough to support the enhancement. If there are other questions, I'm happy to answer them. Otherwise, I will thank the court for its time. Thank you very much, Mr. Carpenter. We appreciate the argument of counsel, as you know from prior experience. Our normal practice would be to come down and greet you in the well of the court, but we're still COVID-limited, so when you're back at a future time when we're not, we'll look forward to shaking hands with you.
judges: G. Steven Agee, Pamela A. Harris, Lydia Kay Griggsby